**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**BRYSON CITY DIVISION**
**2:12 cr 32**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM AND** |
| **Vs.** | ) | **RECOMMENDATION** |
| | ) | |
| **MITCHELL LEON HUGHES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

      **THIS MATTER** is before the Court upon Defendant's Motion to Suppress and Memorandum of Law (#9). The Government has filed Government's Opposition to Motion to Suppress (#10). The undersigned conducted a hearing and heard evidence from the Government and Defendant, and arguments from counsel. Having carefully considered the evidence, briefs, and arguments of counsel, the Court enters the following findings, conclusions and recommendation.

## FINDINGS AND CONCLUSIONS

### I.    Procedural Background

      Defendant is charged in a one count bill of indictment (#1) which alleges that on or about August 2, 2012, Defendant, having been convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess

a firearm which had been shipped or transported in interstate or foreign commerce in violation of 18 U.S.C. § 922(g)(1). Defendant filed his motion to suppress (#9) on February 8, 2013. In the motion, Defendant objects only to the stop of the Toyota vehicle Defendant was operating and the evidence that was discovered as a result of the stop. The Government filed it's opposition to the motion (#10) on February 22, 2013. The Court held a hearing on the motion on March 5, 2013.

## II.    Factual Background

### A.    Cody McKinney

At the hearing, the Government called as a witness Mr. Cody McKinney. In August of 2012 Mr. McKinney was employed as a road patrol deputy with the Cherokee County, North Carolina Sheriff's Office. (T. p. 4.) On August 2, 2012, at approximately 5:30 p.m. Deputy McKinney was on duty and was patrolling in an area in Cherokee County, North Carolina known as the "River Hill Road" located near Hwy. 294. (T. pp. 4-5.) Deputy McKinney described this area as a known "drug area." (T. pp. 4-5.) As Deputy McKinney was traveling in his patrol car in an easterly direction on Hwy. 294, he observed a green Toyota 4Runner vehicle traveling west on the same road. (T. p. 5.) This portion of Hwy. 294 is a rural two-lane roadway with one easterly bound lane of travel and one westerly bound lane of travel divided by a line painted in the center of the road. (T. p. 5.)

As Deputy McKinney met the Toyota, he noticed that the operator of the Toyota did not have a seatbelt strapped across his person. (T. pp. 6, 57.)  N.C.G.S. § 20-135.2A(a) requires occupants of a motor vehicle to wear a seatbelt at all times when the vehicle is in forward motion on a street or highway.  Deputy McKinney made a decision to stop the operator of the Toyota vehicle for this violation. (T. pp. 33, 57.)  Deputy McKinney turned his vehicle from the easterly bound lane of travel of U.S. Hwy. 294 and proceeded to travel in the west bound lane of travel in order to follow the Toyota vehicle. (T. pp. 6-7, 57, 60-61.)  After Deputy McKinney caught up with the Toyota, he observed a State of Tennessee license plate on the Toyota vehicle. (T. p. 59.)  McKinney then used his in-car computer to obtain information concerning the license plate.  McKinney was advised by his in-car computer within five to ten seconds that the plate had been revoked by the State of Tennessee because it was not covered by automobile liability insurance and that the license plate had not been assigned to a green Toyota 4Runner. (T. pp. 6-7, 33-34, 58-59.)  It is a violation of North Carolina law to operate a vehicle on a street or highway in the state without having in full force and effect the financial responsibility required by N.C.G.S. § 20-313.  It is also a violation of North Carolina law to cause to be displayed on a vehicle a registration plate knowing it to be cancelled, revoked or suspended.  N.C.G.S. § 20-111(2).  Finally, it is a further

violation of North Carolina law to use a license plate on a motor vehicle other than that vehicle for which it was issued. N.C.G.S. § 20-111(3).

After receiving the above referenced information from the computer, Deputy McKinney activated his patrol vehicle's blue light in an effort to stop the Toyota vehicle. (T. pp. 8-9.) The vehicle immediately slowed and stopped at a point approximately one-half mile from the border of the State of North Carolina and the State of Tennessee. (T. p. 8.)

Deputy McKinney exited his patrol vehicle and approached the driver's side of the Toyota. McKinney first saw three people in the Toyota, but as he walked closer he saw there were two small children sitting in child seats on either side of the back seat of the vehicle. (T. p. 9.) There was also an adult sitting in the back seat between the two children. (T. p. 9.) Two adult persons were seated in the front seat with a male person sitting on the driver's side and a female sitting on the passenger side. (T. p. 9.) At the time Deputy McKinney approached the vehicle, he decided not to travel up to the driver's door area. Instead, Deputy McKinney stopped between the driver's door and the rear passenger door. (T. p. 15.) Deputy McKinney found that Defendant was the operator of the Toyota vehicle. (T. p. 10.) McKinney noticed that Defendant was wearing his seatbelt at the time McKinney approached the vehicle, unlike what McKinney observed when he initially

encountered the vehicle on U.S. Hwy. 294. (T. pp. 35-36.)  Deputy McKinney told

Defendant he had stopped the Toyota vehicle because Defendant was not wearing

his seatbelt and because the license plate "came back as a fictitious pickup plate

insurance stop." (T. p. 11.)  At that point Deputy McKinney asked Defendant for

his driver's license and proof of insurance and identification. (T. p. 11.)  Deputy

McKinney then asked the other adult occupants of the vehicle for their

identification. (T. p. 11.)  Defendant told Deputy McKinney that Defendant did not

have his driver's license in his possession but gave McKinney Defendant's name

and date of birth. (T. pp. 12, 36.)  Defendant then told Deputy McKinney that he

thought he had a valid driver's license but it might be suspended. (T. p. 13.)  The

failure of an operator of a motor vehicle to have in his possession a valid driver's

license is a violation of N.C.G.S. § 20-7(a).

McKinney determined that the front seat passenger was Misty Stone, who

produced a valid driver's license. (T. p. 13.)   The back seat passenger was Stacy

Mason who provided McKinney with Mason's name and date of birth. (T. p.14.)

Deputy McKinney was at the Toyota collecting information for a period of sixty-

five to seventy seconds. (T. p. 14.)  McKinney then returned to his patrol vehicle

and called his dispatcher by radio. (T. p. 16.)   McKinney requested information

concerning Hughes, Stone, and Mason.  The dispatcher informed McKinney that

no driver's license could be found in the records as having been issued to Defendant, that Ms. Stone's driver's license was valid, and there were arrest warrants outstanding for the arrest of Mr. Mason. (T. pp. 16, 39.) Deputy McKinney then requested assistance to assist with the arrest of Mr. Mason, but he learned that such assistance would take approximately thirty to forty minutes in travel time to arrive. (T. p. 16.) McKinney then decided he would remove Defendant from the vehicle and would then remove and arrest Mr. Mason for the outstanding warrants. (T. pp. 16-17, 40-41.) He also determined that he would arrest Defendant for the traffic violations. Deputy McKinney had determined Defendant had committed the offenses of: (1) not wearing a seatbelt; (2) operating a vehicle with a fictitious license plate; (3) operating a vehicle with no liability insurance; and (4) not having in his possession a valid driver's license. (T. pp. 17-18.) McKinney was in his patrol car talking to the dispatcher for approximately three minutes. (T. p. 19.)

At that point, McKinney exited his patrol vehicle and went back to the Toyota vehicle and told Mr. Mason, who was still sitting in the rear passenger seat, that there were two warrants for Mason's arrest outstanding. He then directed Mason to put his hands on the interior of the roof of the vehicle. (T. pp. 20, 42.) McKinney then stepped forward past the rear passenger door to talk to Defendant.

He told Defendant that there was no record found of Defendant having been issued a driver's license. (T. pp. 40, 42.) While at the driver's door, Deputy McKinney looked into the front passenger area and observed the barrel of a gun. (T. p. 20.) Deputy McKinney then opened the driver's door and had Defendant step out of the Toyota. (T. pp. 20-21, 44-45.) McKinney observed that the barrel of the gun was a shotgun that was wedged between the center console of the Toyota vehicle and the driver's seat. (T. pp. 20, 45-46.) The barrel was pointed in the direction of the front floorboard and the stock was pointed in the direction of the backseat. (T.p. 21.) Approximately a 12-inch section of the firearm was visible from where McKinney was standing outside the vehicle. (T. p. 21.) It is unlawful and in violation of N.C.G.S. § 14-269 for any person to carry concealed about his person a pistol or gun.

After McKinney directed Defendant to exit the vehicle, McKinney placed handcuffs on Defendant and took him to the areas between the Toyota and Deputy McKinney's patrol car and had Defendant sit on the ground. (T. pp. 48-49.) McKinney then took possession of the shotgun and found that it was loaded with ammunition. (T. pp. 24, 51-52.) McKinney found that the shotgun was a pump action 12-guage shotgun which contained between four to five shells. (T. pp. 51-52.) McKinney placed the shotgun in the trunk of his patrol car. (T. pp. 24, 51-52.)

McKinney then returned to the Toyota and directed Mr. Mason to get out of the vehicle. He then arrested Mr. Mason for the outstanding warrants and placed him in handcuffs. (T. p. 49.) Next, Deputy McKinney placed Mr. Mason in the backseat of his patrol car. (T. p. 50.) McKinney placed Defendant in the front passenger seat of his patrol car. (T. p. 54.) McKinney then returned to the Toyota and advised Ms. Stone that she and the children could leave. (T. pp. 53, 69-70.) McKinney then transported Defendant and Mason to the Cherokee County Jail in Murphy, NC, which was located approximately forty to forty-five miles away from the scene of the stop. (T. p. 55.)

While in his patrol vehicle, Deputy McKinney issued Defendant a citation for operating a vehicle without being licensed as a driver in violation of N.C.G.S. § 20-7(a) and displaying a registration plate knowing it to be fictitious in violation of N.C.G.S. § 20-111(2). (T. pp. 62, 65-67.) (Government's Exhibit 1) Later, at the State's Magistrate's Office, Deputy McKinney requested the Magistrate to issue a warrant charging Defendant with carrying a concealed weapon. (T. pp. 62-63.) Deputy McKinney used his discretion and decided not to charge Defendant with not having his seatbelt in place. (T. p. 47.) It was later determined a driver's license had, in fact, been issued to Defendant by the State of Tennessee. (T. p. 39.)

### B.  Misty Stone

Misty Stone was called as a witness by Defendant.  Ms. Stone is the girlfriend of Defendant and was riding as a passenger in the Toyota 4Runner at the time of the traffic stop of August 2, 2012.  Ms. Stone was sitting in the front seat passenger area of the Toyota vehicle. (T. p. 72.)  She observed that at all times while she was in the vehicle on August 2, 2012, Defendant was operating the vehicle and was wearing his seatbelt. (T. p. 72.)  Ms. Stone and Defendant had borrowed the green Toyota 4Runner from their landlord, Matthew Hamby, for the purpose of traveling to the grocery store. (T. pp. 75-76.)  Ms. Stone did not know the shotgun was in the vehicle and could not see it from the passenger seat. (T. p. 78.)  She did not know the shotgun was in the Toyota vehicle until after Deputy McKinney had removed it from the vehicle. (T. pp. 78, 82-83.)

## III.  Discussion

### A.     Standard Applicable to the Motion to Suppress

The Fourth Amendment of the United States Constitution provides:

Amendment IV.

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation and particularly describing the place to be searched and the persons or things to be seized.

When a defendant moves to suppress evidence seized during an investigatory stop, the United States Supreme Court has held that the

> Fourth Amendment protects citizens from "unreasonable searches and seizures" by the government, and its protections extend to brief investigatory stops…that fall short of traditional arrest.

United States v. Arvizu, 534 U.S. 266, 273 (2002) (citing Terry v. Ohio, 392 U.S. 1, 9 (1968)).  In those situations, the Court looks to whether the actions of law enforcement are supported by a reasonable articulable suspicion that criminal activity "may be afoot."  United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry, 392 U.S. at 30).

To determine whether an investigatory stop meets the requirements of the Fourth Amendment, the Court must "look at the totality of the circumstances" to see whether the detaining officer had a "particularized and objective basis" for suspecting legal wrongdoing.  Arvizu, 534 U.S. at 273.  The Court's inquiry is objective rather than subjective, in that the Fourth Amendment inquiry "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time", not what an officer thought or anticipated at the time.  Maryland v. Macon, 472 U.S. 463, 470-71 (1985) (citation and quotations omitted).

Whenever an investigative stop is based on less than probable cause, it

"must be temporary and last no longer than is necessary to effectuate the purpose of the stop." Id., at 500. An ordinary traffic stop is classified as a "limited detention" and is governed by the Terry standards. United States v. Rusher, 966 F.2d 868 (4th Cir. 1992). An officer can do no more than ask for a driver's license and vehicle registration, run a computer check, and issue a citation during an *ordinary* traffic stop. Id. An "articulable and reasonable suspicion" requires some minimal level of objective justification for the stop, which must be more than an unparticularized "hunch," but less than the level of suspicion required for probable cause. United States v. Sokolow, 490 U.S. 1 (1989); United States v. Hensley, 469 U.S. 221 (1985); United States v. Hines, 943 F.2d 348 (4th Cir. 1991).

A "totality of the circumstances" test is used to determine the existence of a reasonable suspicion of criminal conduct. United States v. Sokolow, 490 U.S. at 8. Factors to be considered in measuring the reasonableness of a stop include:

a.      the area's disposition toward criminal activity;

b.      the time of the stop; and

c.      any suspicious conduct assessed in light of the officer's expeience.

In United States v. Digiovanni, 650 F.3d 498 (4th Cir. 2011), the Fourth Circuit Court of Appeals set forth the standard to be applied in determining the constitutionality of a traffic stop:

Because a traffic stop is more analogous to an investigative detention than a custodial arrest, we treat a traffic stop, whether based on probable cause or reasonable suspicion, under the standard set forth in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Berkemer v. McCarty, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); Pennsylvania v. Mimms, 434 U.S. 106, 109, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (*per curiam*); United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992).

Pursuant to Terry, we analyze the propriety of a traffic stop on two fronts. First, we analyze whether the police officer's action was justified at its inception. Rusher, 966 F.2d at 875. Second, we analyze whether the police officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop. Id.

**B.     Was Deputy McKinney's Action in Stopping the Toyota Vehicle Justified at its Inception?**

The question for the Court as to the first prong of the Terry analysis is whether the initial traffic stop was justified. United States v. Digiovanni, at 506. As the Fourth Circuit explained in United States v. Hassan-el, 5 F.3d 726 (4th Cir. 1993):

Under the objective test, if an officer has probable cause or a reasonable suspicion to stop a vehicle, there is no intrusion upon the Fourth Amendment. That is so regardless of the fact that the officer would not have made the stop but for some hunch or inarticulable suspicion of other criminal activity:

When an officer observes a traffic offense---however minor---he has probable cause to stop the driver of the vehicle…[T]his otherwise valid stop does not become unreasonable merely because the officer has intuitive suspicions that the occupants of the car are engaged in some sort of criminal activity…[T]hat stop remains valid even if the

12

officer would have ignored the traffic violation but for his other suspicions. <u>Cummins</u>, 920 F.2d at 500-01; *see also* <u>Trigg</u>, 878 F.2d at 1041 ("So long as the police are doing no more than they are legally permitted and objectively authorized to do, an arrest is constitutional." (citing <u>Causey</u>, 834 F.2d at 1184)). Such an approach minimizes inquiry into a police officer's state of mind.

We adopt the objective test and likewise hold that when an officer observes a traffic offense or other unlawful conduct, he or she is justified in stopping the vehicle under the Fourth Amendment. Such a limited detention does not become "unreasonable merely because the officer has intuitive suspicions that the occupants of the car are engaged in some sort of criminal activity." <u>Cummings</u>, 920 F.2d at 499-501 (noting that the officer testified he probably would not have stopped the car if the defendant and his passenger had not continued glancing at him and behaving suspiciously).

The facts of this case show that McKinney's decision to initially stop the vehicle was substantially justified. While patrolling in an area known as a "drug area", Deputy McKinney saw a vehicle being operated by a person who was not wearing a seatbelt, which is a violation of North Carolina law. At that time, Deputy McKinney had reasonable cause to stop the vehicle. <u>Whren v. United States</u>, 517 U.S. 806 (1996). Before he stopped the vehicle, Deputy McKinney used his in-car computer to check the license plate and found that the plate had been revoked because it was not subject to a valid and in force policy of automobile liability insurance and the plate had not been assigned to the green Toyota vehicle. These two violations are more serious violations of North Carolina law than operating a vehicle without using a seatbelt. Thus, Deputy

McKinney had sufficient justification to stop the Toyota vehicle; his stop was lawful and was supported by more than a reasonable suspicion.

**C.  Were Deputy McKinney's Subsequent Actions Reasonably Related in Scope to the Circumstances that Justified the Stop?**

In the context of traffic stops, police diligence includes requesting a driver's license and vehicle registration, running a computer check, and issuing the ticket. United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004).   After stopping the vehicle and without delay, Deputy McKinney approached the Toyota vehicle and requested Defendant's driver's license.  Deputy McKinney found that Defendant did not have a driver's license in his possession while operating the vehicle, which is a separate violation of N.C.G.S. § 20-7(a).  Deputy McKinney then asked for identification from the two adult passengers, which is allowed pursuant to United States v. Soriano-Jarquin, 492 F.3d 495 (4th Cir. 2007).  This period of intrusion lasted no more than 65 to 70 seconds and did not prolong the stop. (T. p. 14.) Deputy McKinney then went to his patrol car and during a three minute period of time in radio discussion with his dispatcher, Deputy McKinney was told Defendant had not been issued a driver's license and, more importantly, that outstanding warrants had been issued for the arrest of Mr. Mason.  Although he called for assistance, Deputy McKinney knew he would have to wait thirty to forty minutes for other officers to arrive. (T. p. 16.)  Rather than wait, Deputy McKinney went

directly to the Toyota vehicle to arrest Mr. Mason upon the charges for the outstanding warrants and to arrest Defendant for the traffic offenses that, in McKinney's opinion, Defendant had committed in the Deputy's presence. These actions of the Deputy were the least intrusive means reasonably available to verify or dispel the Deputy's suspicion in a short period of time and were pursued in a manner that confirmed his suspicions quickly. United States v. Digiovanni, 650 F.3d 498 (4th Cir. 2011). The amount of time used by Deputy McKinney in his investigation was approximately six to seven minutes, which is well less than the eleven minute period of time that was approved in United States v. Mason, 628 F.3d 123 (4th Cir. 2010), and was a de minimis delay. Deputy McKinney's actions were reasonably related in scope and duration to the circumstances that justified his stop of the Toyota vehicle and satisfy the requirements and standards of Terry.

Defendant, however, contends the only reason Deputy McKinney stopped the Toyota vehicle was because he mistakeningly thought he saw that Defendant did not have his seatbelt buckled when the Toyota and the patrol vehicle passed each other in their initial encounter on U.S. Hwy. 294. Defendant contends that during the stop Deputy McKinney saw Defendant had his seatbelt buckled and, thus McKinney should have ceased his investigation and immediately allowed

Defendant to leave. Defendant does not cite any case on point for this contention, and the Court cannot find any authority in support of such a contention.

As a threshold matter, Defendant's argument ignores the fact that McKinney had two additional reasons for stopping the vehicle: (1) the license plate tag on the Toyota vehicle had been revoked for lack of liability insurance coverage; and (2) the license plate was not a valid plate issued for the Toyota vehicle. Defendant's contention concerning the stop fails to account for these two additional and more compelling violations of law which provided additional justification for Deputy McKinney to ask for the Defendant and his passenger's identification.

The Defendant further contends Deputy McKinney should have issued Defendant a citation for not having a driver's license and then allowed Defendant to leave the scene of the stop. Defendant does not address or provide reasoning as to why the Deputy should forego investigation of the license plate violations nor why Deputy McKinney should fail in his duty to arrest Mr. Mason for the warrants that were outstanding for his arrest. The Court finds that McKinney's actions, after stopping the vehicle, were reasonably related in scope to the circumstances that justified the stop and did not run afoul of the Fourth Amendment.

Finally, the evidence shows that Defendant had committed multiple violations of the traffic laws of North Carolina in the presence of Deputy

McKinney. Deputy McKinney was objectively justified in asking for Defendant to get out of the Toyota vehicle and the resulting discovery of the shotgun was well within the limits of the Fourth Amendment. Ohio v. Robinette, 519 U.S. 33, 40 (1996). Finding that the contentions of Defendant have no merit and further finding that the traffic stop conducted by Deputy McKinney satisfied the standards set forth in Terry, the undersigned will recommend that the motion of Defendant to suppress be denied.

## RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that Defendant's Motion to Suppress (#9) be **DENIED.**

Signed: May 29, 2013

Dennis L. Howell
United States Magistrate Judge

17

## **Time for Objections**

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), and Rule 72, Federal Rules of Civil Procedure, written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same.

**Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert. denied, 467 U.S. 1208 (1984).